1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

FRANK S. HOMSHER, WSBA #26935
LAW OFFICE OF FRANK S. HOMSHER
510 BELL STREET
EDMONDS, WA 98020
(425) 440-3411
frank@homsherlawgroup.com
*Attorney for Plaintiff*

## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| ROB STAHNKE, an individual, | CASE NO. |
| Plaintiff, | |
| v. | |
| | **COMPLAINT FOR DAMAGES** |
| CITY OF SEATTLE, a municipality; JENNY DURKIN, an individual; and BRUCE HARRELL, an individual, | |
| Defendants | |

Plaintiff ROB STAHNKE, by and through his counsel of record, FRANK S. HOMSHER, alleges the following:

## I.    INTRODUCTION

In August 2021, Defendant JENNY DURKIN, as Mayor of the City of Seattle, issued a Covid-19 vaccine mandate for all employees of the City of Seattle. At the time, Plaintiff ROB STAHNKE was a Senior Auto Mechanic with the Vehicle Management Department of the City of Seattle. Initially, ROB STAHNKE was reluctant to get the Covid-19 vaccine because he had learned that there were potentially severe adverse effects associated with the Covid-19 vaccine. Not wanting to lose his job or his pension for refusing to get the Covid-19 vaccine, ROB STAHNKE got the Moderna Covid-19 vaccine on September 2, 2021.

Beginning the same day he received the Moderna Covid-19 vaccine, ROB STAHNKE began to suffer an extreme adverse reaction to the Moderna Covid-19 vaccine, including cardiac episodes, severe inflammation, and severe nerve pain. ROB STAHNKE's doctor diagnosed him with "severe peripheral vascular disease" directly attributable to his receiving the Moderna Covid-19 vaccine. For the next several months, ROB STAHNKE suffered through severe inflammation and excruciating nerve pain that could not be controlled through physical therapy and other treatments. ROB STAHNKE received monthly shots of Toradol, an anti-inflammatory, from his doctor that provided only temporary relief.

Despite acknowledging that the Covid-19 vaccine caused ROB STAHNKE's condition, Defendant CITY OF SEATTLE initially refused to allow ROB STAHNKE a medical exemption from having to take the second Covid-19 vaccination dose. Although ROB STAHNKE was eventually granted an exemption from the second Covid-19 vaccination dose, Defendant CITY OF SEATTLE still pressured him to get another dose.

Since ROB STAHNKE was unable to receive the second Covid-19 vaccination dose, he was considered disabled and entitled to protections of the Americans with Disabilities Act and Washington Law Against Discrimination. Defendant CITY OF SEATTLE was required to act in good faith to provide ROB STAHNKE with reasonable accommodations for his disability. Despite ROB STAHNKE providing multiple options for reasonable accommodations for him, and supervisors in his department agreeing with the recommendations, senior officials with Defendant CITY OF SEATTLE rejected the suggestions and focused solely on the fact that ROB STAHNKE was not fully-vaccinated. Internal emails from the City of Seattle Facilities and Administrative Services Department show they had no intentions of reasonably accommodating any City of Seattle employee who received an exemption from the Covid-19 vaccine mandate.

COMPLAINT FOR DAMAGES
*(Stahnke v. City of Seattle, et al)*
Page 2 of 23

**Law Office of Frank S. Homsher**
510 Bell Street
Edmonds, WA 98020
Tel. (425) 440-3411
E: frank@homsherlawgroup.com

On February 16, 2022, ROB STAHNKE received notice that Defendant CITY OF SEATTLE could not make reasonable accommodations for ROB STAHNKE, which was clearly due to his vaccination status – even though he was medically exempt, and that his last day in his position would be March 2, 2022.

## II.      PARTIES

1.      Plaintiff ROB STAHNKE ("ROB") is a resident of Snohomish County, Washington.

2.      Defendant CITY OF SEATTLE is a municipality located in King County, Washington.

3.      Defendant JENNY DURKIN ("Mayor DURKIN") was the Mayor of the City of Seattle at all times pertinent to the facts and claims alleged in this Complaint. Upon information and belief, Defendant JENNY DURKIN resides in King County, Washington.

4.      Defendant BRUCE HARRELL ("Mayor HARRELL") is the current mayor of the City of Seattle. Upon information and belief, Defendant BRUCE HARRELL resides in King County, Washington.

## II.      JURISDICTION AND VENUE

5.      This Court has jurisdiction over the subject matter of this Complaint pursuant to 28 U.S.C. § 1332 because one or more of Plaintiff's claims arise under the  United States Constitution.

6.      The Court has personal jurisdiction over each of the Defendants because they are all residents of King County, Washington and, therefore, this District.

7.      Venue is proper in the United States District Court for the Western District of Washington pursuant to 28 U.S.C. § 1391 because all of the events giving rise to Plaintiff's claims occurred in this District.

## III.      STATEMENT OF FACTS

**Law Office of Frank S. Homsher**
510 Bell Street
Edmonds, WA 98020
Tel. (425) 440-3411
E: frank@homsherlawgroup.com

8.      In August 2021, Mayor DURKIN issued a Covid-19 vaccine mandate for all City of Seattle employees.

9.      ROB STAHNKE subsequently lost his job as a Senior Auto Mechanic with the Vehicle Management Department of the City of Seattle after he was severely injured from taking the first dose of the experimental Moderna Covid-19 vaccine. Unable to take the second dose of the Moderna Covid-19 vaccine, due to the risk of further severe injury or even death, ROB STAHNKE received a medical exemption from taking the second shot.

10.     However, due to his vaccination status, Defendant CITY OF SEATTLE refused to provide ROB STAHNKE with reasonable accommodations as required under law.

11.     Because of the vaccine mandate recklessly issued by Mayor DURKIN under her emergency powers, ROB STAHNKE was injured by the experimental MODERNA vaccine and was then terminated for not being fully-vaccinated, despite having a medical exemption.

12.     Mayor DURKIN, however, abused her emergency powers because the landscape of COVID-19 and the vaccine had changed substantially by the time she issued the mandate. The science had developed significantly over a year-and-a-half. Still, Mayor DURKIN did not consider any new developments when she issued the vaccine mandate. There is no evidence that she vetted her decision through medical professionals who could evaluate the state of the evidence regarding the virus and the vaccine. Instead, Mayor DURKIN, by all accounts, rubber-stamped the mandate because Governor Jay Inslee and President Biden both proclaimed mandates. Even without doing any meaningful investigation of the safety of the vaccines, Mayor DURKIN required the City of Seattle employees to take one of three experimental shots – Pfizer, Moderna, or Johnson & Johnson – or they would lose their jobs.

COMPLAINT FOR DAMAGES
*(Stahnke v. City of Seattle, et al)*
Page 4 of 23

**Law Office of Frank S. Homsher**
510 Bell Street
Edmonds, WA 98020
Tel. (425) 440-3411
E: frank@homsherlawgroup.com

13.     Mayor DURKIN forced people to choose between their economic security and an experimental shot without fully disclosing what adverse effects could happen if a medical professional injected them. Mayor DURKIN agreed with the commercials Washington State put out that unequivocally stated that the experimental shots were "safe."

14.     When mayor DURKIN issued the mandate, science publications from around the globe had concluded that working-age adults had a near-zero percent chance of dying from COVID-19. The developing science made clear that THERE WAS NO EMERGENCY except for people with multiple comorbidities and above those 70 years old.

15.     Mayor DURKIN treated the experimental shots as if they were "safe." Were the vaccines safe? Answer: <u>No, the vaccines were not safe</u>. All three experimental shots used unproven technology never before tried on such a large scale. Furthermore, Mayor DURKIN employed a one-size-fits-all solution that did not consider facts that could substantially harm the person getting the shot. She presumed the experimental shots were safe for all City of Seattle employees.

16.     There is no evidence that Mayor DURKIN considered that the VAERS (Vaccine Adverse Reaction Site) data had already shown nearly a million injuries and tens of thousands of deaths. Here are the VAERS numbers as of December 31, 2021, a short time after Mayor DURKIN issued her mandate):

1,016,999 TOTAL REPORTED ADVERSE EVENTS

Through December 31, 2021

DEATHS - 21,382

HOSPITALIZATIONS - 113,303

URGENT CARE - 110,785

DOCTOR OFFICE VISITS - 158,762

**Law Office of Frank S. Homsher**
510 Bell Street
Edmonds, WA 98020
Tel. (425) 440-3411
E: frank@homsherlawgroup.com

ANAPHYLAXIS - 8,765

BELL'S PALSY - 12,765

Miscarriages - 3,511

Heart Attacks - 10,863

Myocarditis/Pericarditis - 23,713

Permanently Disabled - 36,758

Thrombocytopenia/ Low Platelet - 5,102

Life Threatening - 24,344

Severe Allergic Reaction - 36,955

Shingles - 11,628[1]

17.    The frightening thing about VAERS is that the system suffers from gross underreporting by between 5 and 10 times and as-high-as 40 times.[2] These experimental shots are the most deadly and destructive in history, even before employing a multiplier, even looking at these underreported numbers. Because of the massive number of deaths and injuries, the FDA should have pulled these three shots off the market long before Mayor DURKIN's mandate. Mayor DURKIN should have known this.

18.    From the start of the vaccine to the point Mayor DURKIN issued her mandate, how medical professionals treated Sars COVID 2 patients was to tell them to stay home until they were too sick to stay at home, then recommended that they go to the hospital. Neither the CDC nor the

---

[1] https://openvaers.com/covid-data. See also https://vaersanalysis.info/2022/01/14/vaers-summary-for-covid-19-vaccines-through-01-07-2022/.

[2] Center for Disease Control and Prevention Morbidity and Mortality Weekly Report, COVID-19 Vaccine Safety in Children Aged 5–11 Years — United States, November 3–December 19, 2021 (CDC admits that VAERS under-reports by 4.5 times) (December 22, 2021); Electronic Support for Public Health–Vaccine Adverse Event Reporting System (ESP:VAERS), a Harvard Pilgrim Study (2010)(Stated that less than 1% of the adverse events were reported in the VAERS system);

**Law Office of Frank S. Homsher**
510 Bell Street
Edmonds, WA 98020
Tel. (425) 440-3411
E: frank@homsherlawgroup.com

NIAID tried to rally the medical researchers to work on an early treatment protocol that would keep people from getting so sick that they needed to go to the hospital. Their aberrant behavior showed that they lacked any interest in finding a low-cost and effective way to combat the COVID-19 Pandemic. The result was that more people died than should have died.

19.     A pre-print journal article titled, Worldwide Bayesian Causal Impact Analysis of Vaccine Administration on Deaths and Cases Associated with COVID-19: A Big Data Analysis of 145 Countries[3] showed that deaths rise substantially immediately after a campaign to push the vaccines. The analysis is shocking and provides strong evidence that these vaccines cause increased deaths.

20.     In January 2022, Scott Davison, CEO of the Indiana insurance company OneAmerica, stated that death from all causes among working-age adults (18-64) increased about 40% in 2021. He said, "And what we saw just in the third quarter, we're seeing it continue into the fourth quarter, is that death rates are up 40% over what they were pre-pandemic."[4] He added, "Just to give you an idea of how bad that is, a three-sigma or a one-in-200-year catastrophe would be 10% increase over pre-pandemic," he said. "So, 40% is just unheard of." Davison said the increase in deaths represents "huge, huge numbers," and that's it's not elderly people who are dying, but "primarily working-aged people 18 to 64" who are the employees of companies that have group life insurance plans through OneAmerica.[5] Davison added that disability claims are up as well. The evidence is clear that COVID-19 does not pose a significant danger to the working-age population;

---

[3] by Kyle A. Beattie Department of Political Science University of Alberta, CANADA, kbeattie@ualberta.ca.
[4] https://www.thecentersquare.com/indiana/indiana-life-insurance-ceo-says-deaths-are-up-40-among-people-ages-18-64/article_71473b12-6b1e-11ec-8641-5b2c06725e2c.html.
[5] Id.

**Law Office of Frank S. Homsher**
510 Bell Street
Edmonds, WA 98020
Tel. (425) 440-3411
E: frank@homsherlawgroup.com

yet, something in late 2021 caused working-age people to die at an alarming rate; it was not COVID-19.

21.     The strange and suspicious thing about these three vaccines is that Big Pharma chose to employ the virus' spike protein as the part of the virus that the experimental shots would replicate.[6] The spike protein is the most dangerous physical part of SARS Covid-2. Studies have shown that these vaccines created spike proteins that circulate about the body and do immense harm to bodily organs such as the heart, reproductive organs, and the brain.[7] Why would Big Pharma employ the spike protein when they knew it was dangerous and would be replicated and move around the human body?

22.     It is disconcerting that the NIH, CDC, and NIAID have discouraged autopsies.[8] Yet, autopsies are the only way to determine the cause of death and remove any doubt about that cause. Autopsies are also very important to investigate vaccine safety. It seems like there was something that these organizations did not want forensic scientists to see by discouraging autopsies. Where professionals have performed autopsies, the results have yielded alarming results, including that the spike protein tends to attack the heart.[9]

---

[6] https://www.mayoclinic.org/johnson-johnson-adenovirus-vaccine-explained/vid-20510091.
[7] https://childrenshealthdefense.org/defender/covid-vaccine-spike-protein-travels-from-injection-site-organ-damage/; https://childrenshealthdefense.org/defender/pfizer-vaccine-linked-heart-inflammation/; https://childrenshealthdefense.org/defender/moderna-pfizer-vaccines-blood-clots-inflammation-brain-heart/; and https://childrenshealthdefense.org/defender/nih-study-confirms-covid-vaccines-affect-menstrual-cycle/.
[8] https://lichtnahrung2015.wordpress.com/2021/07/04/shocking-new-study-reveals-covid-vaccine-terminates-4-out-of-5-pregnancies-via-spontaneous-abortions/.
[9] Top German pathologist Dr. Arne Burkhardt's autopsy research shows clear evidence that all gene-based vaccines, independent of manufacturers, produced the same result in the vaccines. In the organs of these people, in 90% he found autoimmune self attack by killer lymphocytes on the tissues. The main ones being the heart, the lung, then other tissues such as liver, etc. Dr. Bhakdi confirms these vaccines are killing the young and the old.

**Law Office of Frank S. Homsher**
510 Bell Street
Edmonds, WA 98020
Tel. (425) 440-3411
E: frank@homsherlawgroup.com

23.     The abstract of an article published November 8, 2021, <u>Observational Findings of PULS Cardiac Test Findings for Inflammatory Markers in Patients Receiving mRNA Vaccines</u> published in the medical journal Circulation, states the following conclusion:

> [T]he mRNA vacs numerically increase (but not statistically tested) the markers IL-16, Fas, and HGF, all markers previously described by others for denoting inflammation on the endothelium and T cell infiltration of cardiac muscle, in a consecutive series of a single clinic patient population receiving mRNA vaccines without a control group.[10]

Heart inflammation is a dangerous condition related to heart attacks and cardiac arrest. If the CDC and FDA had been looking out for us when this report came out, they would have pulled all the experimental vaccines. Yet, the mandates kept rolling along.

24.     When mayor DURKIN acted, <u>there were a lot of peer-reviewed medical articles both in the United States and around the world showing that the vaccines were not safe as well as the VAERS numbers and the European Union numbers from their adverse reaction from vaccine system.</u> Yet, Mayor DURKIN did not mention anything about the hazardous nature of the experimental shots. She put her blind trust in Big Pharma and the judgment of a compromised CDC and FDA.

25.     The Covid-19 vaccine was not necessary to protect City of Seattle employees.

26.     At the Pandemic's start, government scientists relied on the pandemic models from the Imperial College and the University of Washington. Medical researchers discredited these models when the actual data began to flow.[11] By the time Mayor DURKIN adopted the mandate, medical researchers knew that SARS Covid 2 was most dangerous to the elderly, especially those

---

[10] https://www.ahajournals.org/doi/10.1161/circ.144.suppl_1.10712; https://childrenshealthdefense.org/defender/heart-inflammation-linked-covid-pfizer-moderna-vaccines-u-s-military/

[11] The Failure of Imperial College Modeling Is Far Worse than We Knew, American Institute for Economic Research, by Phillip W. Magness, August 21, 2021. https://www.aier.org/article/the-failure-of-imperial-college-modeling-is-far-worse-than-we-knew/

**Law Office of Frank S. Homsher**
510 Bell Street
Edmonds, WA 98020
Tel. (425) 440-3411
E: frank@homsherlawgroup.com

with several comorbidities.[12] Studies had determined that the risk of dying from SARS Covid 2 was less than the seasonal flu for the working-age population. The vast majority of healthy people, younger than 70 years old, had sufficiently robust immune systems to handle the virus.

27.     Mayor DURKIN did not differentiate between these known risks when mandating the vaccine. She treated everyone as if they had the same risk when, in fact, the working-age population has a relatively low risk of dying from Covid-19. As a result, for these people, there was more danger from taking the vaccine than from contracting Covid-19.[13]

28.     The best strategy was to isolate the sick and most vulnerable and allow those who were healthy to live their lives.[14] Their immune systems, a wonder of nature, would provide sufficient defense. America has the best doctors in the world. We have the CDC, NIH, and world-class research universities who should have been working on the most essential of problems. How can we treat the people of the United States with early treatment so that they do not get highly sick from SARS Covid 2 so that they need to go to the hospital?

29.     Any good medical establishment would have put the world-class brainpower available across the United States on this life-saving task. Rather than put massive energy and brainpower into ensuring that the American population would not be left untreated and unprotected, the CDC, NIAID, FDA encouraged just the opposite. They demonized doctors who suggested early treatments even though these early treatment protocols saved lives worldwide. The aberrant behavior

---

[12] https://www.un.org/sites/un2.un.org/files/un_policy_brief_on_covid-19_and_older_persons_1_may_2020.pdf
[13] See the VAER NUMBERS ABOVE.
[14] https://www.arkansasonline.com/news/2020/nov/15/compassionate-covid-strategy/;
https://www.statista.com/statistics/1191568/reported-deaths-from-covid-by-age-us/

**Law Office of Frank S. Homsher**
510 Bell Street
Edmonds, WA 98020
Tel. (425) 440-3411
E: frank@homsherlawgroup.com

of our medical research professionals should have alerted Mayor DURKIN that something was amiss.

30.     Why didn't our medical leadership choose this highly reasonable and effective, low-cost method of dealing with the Pandemic? Why was a constant message of fear being pumped out by Dr. Fauci and the news media when it became evident that the mortality rate was nowhere near what medical professionals thought it initially was? The answer is obvious. Neither the FDA, NAID, CDC, nor Big Pharma wanted the development of early treatment protocols. <u>One or more early treatments would have removed any basis for the Emergency Use Authorization for the three shots</u>. Big Pharma wanted a massive payday no matter how many Americans were harmed by the lack of an early treatment protocol. It did whatever it had to make that payday happen.

31.     The CDC, NIAID, and FDA actively degrade and demonize so-called "off label" drugs that work against Covid-19 and would have saved lives: Ivermectin and Hydroxychloroquine are just two examples. During 2020 and 2021, an army of critics demonized any suggested early treatment by an off-label drug. By every measure, Ivermectin and Hydroxychloroquine are "wonder drugs" with multiple worldwide applications, and they have very few adverse side effects. Yet, these drugs previously heralded drugs were depicted as two of the most dangerous drugs in the history of the world. It is strange when safe drugs are called dangerous and dangerous drugs, like the three experimental shots are treated as safe.

32.     After the cascade of utter demonization, Ivermectin and Hydroxychloroquine have been tested and found beneficial in the fight against Covid19 and have contributed to saving lives around the world during the Pandemic[15] Most notably, Africa, whose populace uses Ivermectin and

---

[15] https://principia-scientific.com/more-good-news-on-ivermectin/; https://c19ivermectin.com/

**Law Office of Frank S. Homsher**
510 Bell Street
Edmonds, WA 98020
Tel. (425) 440-3411
E: frank@homsherlawgroup.com

Hydroxychloroquine regularly has the lowest incidence of Covid-19 in the world. Meanwhile, the countries relying on a vaccine-only strategy have experienced the highest death rates.[16]

33.     Doctors who have relied on a multi-drug early treatment protocol[17] to treat their patients suffering from mild and severe cases of Covid-19 are shunned and persecuted. Yet, they have shown through their actual treatment of patients that a multi-drug approach saves lives by mitigating the harmful effects of Covid-19 so that their patients do not ever need to go to the hospital. Doctors around the globe employ these early treatment protocols (Zalenko, McCullough, and others) to allow people to deal with COVID-19 at home and not at the hospital. Another disturbing thing is that the use of nasal and oral antiseptics (e.g., povidone-iodine) by the general populace (spraying the nose and gargling twice a day) would have greatly inhibited the spread and intensity of the virus.[18]

34.     Something irregular was going on when the CDC, NIH, NIAID, and every research university and hospital in the United States uniformly decided not to determine the value of already having had SARS Covid 2, so-called "Natural Immunity." Typically, natural immunity is the gold standard of epidemiology. Recently, a public records act request forced the CDC to admit that it has no recorded case of someone who has natural immunity but has re-infected or transmitted SARS Covid 2.[19] Israeli scientists have done significant work regarding natural immunity during the COVID-19 era.

---

[16] https://c19hcq.com/. https://www.worldometers.info/coronavirus/#countries
[17] American Journal of Medicine, Pathophysiological Basis and Rationale for Early Outpatient Treatment of SARS-CoV-2 (COVID-19) Infection https://www.amjmed.com/article/S0002-9343(20)30673-2/fulltext (January 1, 2021). Reviews in Cardiovascular Medicine, Multifaceted highly targeted sequential multidrug treatment of early ambulatory high-risk SARS-CoV-2 infection (COVID-19) (November 27, 2020) https://imrpress.com/journal/RCM/21/4/10.31083/j.rcm.2020.04.264
[18] https://pubmed.ncbi.nlm.nih.gov/33397432/; https://pubmed.ncbi.nlm.nih.gov/33464122/
[19] https://dailyexpose.uk/2021/11/13/cdc-confirms-they-have-no-recorded-case-of-someone-who-has-natural-immunity-being-re-infected-or-transmitting-covid/. CDC Confirms They Have No Recorded Case of Someone Who

**Law Office of Frank S. Homsher**
510 Bell Street
Edmonds, WA 98020
Tel. (425) 440-3411
E: frank@homsherlawgroup.com

35.     When mayor DURKIN declared her vaccine mandate, medical researchers already knew that the vaccines were "leaky,"[20] which meant they would never eradicate COVID-19.

36.     When Mayor DURKIN issued her mandate, she also took on the burden of meeting the disclosure requirements for experimental treatment delineated in the Nuremberg Code:

1.     **The voluntary consent of the human subject is absolutely essential.** This means that the person involved should have legal capacity to give consent; should be so situated as to be able to exercise free power of choice, without the intervention of any element of force, fraud, deceit, duress, over-reaching, or other ulterior form of constraint or coercion; and should have sufficient knowledge and comprehension of the elements of the subject matter involved, as to enable him to make an understanding and enlightened decision. This latter element requires that, before the acceptance of an affirmative decision by the experimental subject, there should be made known to him the nature, duration, and purpose of the experiment; the method and means by which it is to be conducted; all inconveniences and hazards reasonably to be expected; and the effects upon his health or person, which may possibly come from his participation in the experiment. The duty and responsibility for ascertaining the quality of the consent rests upon each individual who initiates, directs or engages in the experiment. It is a personal duty and responsibility which may not be delegated to another with impunity.

37.     The truth is that Mayor DURKIN did not meet the notice requirement of the Nuremberg Code, because the potential negative adverse effects (short term and long-term) of all three of the Covid-19 experimental shots are unknown to the makers. Unfortunately, Mayor DURKIN has exposed herself to being hauled into the Hague to face charges of crimes against humanity.

38.     There is no doubt that Mayor DURKIN violated the Nuremberg Code.

39.     Mayor DURKIN's experimental shot mandate was not well-grounded in science or law. She exceeded her authority.

---

Has Natural Immunity Being Re-Infected or Transmitting Covid by Rhoda Wilson, November 11, 2021. https://childrenshealthdefense.org/defender/research-natural-immunity-covid-brownstone-institute/.
[20] https://www.independent.co.uk/news/article.asp?id=13729.

COMPLAINT FOR DAMAGES
*(Stahnke v. City of Seattle, et al)*
Page 13 of 23

**Law Office of Frank S. Homsher**
510 Bell Street
Edmonds, WA 98020
Tel. (425) 440-3411
E: frank@homsherlawgroup.com

40. The new Mayor, Bruce Harrell, did not make any meaningful change to Mayor DURKIN's mandatory experimental shot. He stood idly by as experienced employees, like ROB, were terminated or forced out of their jobs by the City of Seattle.

## THE SPECIFIC CASE OF ROB STAHNKE

### A. INJURY BY VACCINE MANDATE

41. ROB STAHNKE had an excellent reputation with his supervisors and co-workers and an excellent employee record.

42. ROB was reluctant to take one of the three experimental shots because he had learned about some of the risks of taking them. He had heard that there was a possibility that those who capitulated to the mandate could suffer severe adverse effects.

43. After much deliberation, ROB decided to get the MODERNA shot to keep his job and his pension on September 2, 2021.

44. ROB's adverse reaction started that same day with cardiac episodes, which turned into excruciating back pain over the next three days. On September 18th, ROB had a high fever that lasted for three days; a skin infection broke out on his left leg and side, and his left leg had begun experiencing painful inflammation. On September 23, 2021, ROB reported his adverse reaction to the MODERNA shot to the VAERS system; he also reported the incident to the Pharmacy that administered the shot. His doctor diagnosed Rob with "severe peripheral vascular disease", an extreme inflammatory reaction to the MODERNA shot.

45. ROB's doctor ordered a blood test that discovered that ROB had a high amount of AGG antibodies (the SARS Covid 2 antibody). His doctor concluded that ROB had gotten these antibodies from previous exposure to SARS Covid 2. ROB had worked many months on-site

**Law Office of Frank S. Homsher**
510 Bell Street
Edmonds, WA 98020
Tel. (425) 440-3411
E: frank@homsherlawgroup.com

because the City of Seattle designated him as "essential staff." He went to the shop, where they employed masks and social distancing.

46.     ROB's doctor opined that Covid-19 antibodies already present in ROB's body might have contributed to the extreme adverse reaction to the MODERNA shot.

47.     Inflammation soon settled in ROB's spine and remained even after his swollen left leg slowly improved, resulting in 5 months of severe nerve pain in both the sciatic and femoral nerves. This constant pain made it difficult for ROB to sit or lay down, so he rarely slept for months. Daily life was extraordinarily harsh and pain-filled.

48.     Rob visited his doctor and participated in physical therapy and other treatments to control the inflammation and pain. None of these worked. His doctor began injecting ROB with an anti-inflammatory called Toradol, which offered occasional, temporary relief. Patients can only receive an injection of Toradol once a month.

49.     This vaccine resulted directly in ROB's injuries. The City has already acknowledged this. The City approved Rob's medical exemption from receiving the 2nd vaccination dose in the Brian Sharkey Memo dated October 25, 2021. Ray Sugarman, acknowledge ROB's exemption again in a February 8, 2022 letter.

50.     ROB's inability to receive a second shot created a disability for which ROB was afforded the protections of the ADA and WLAD. Thus, the City was required to engage in a good-faith process with ROB to determine a reasonable accommodation.

51.     ROB suggested a reasonable accommodation – moving ROB's motorcycle repair area to an empty shop in the SeaPark garage, which Facilities and Administrative Services ("FAS") had previously used for shop work. ROB's managers supported this reasonable accommodation and

COMPLAINT FOR DAMAGES
*(Stahnke v. City of Seattle, et al)*
Page 15 of 23

**Law Office of Frank S. Homsher**
510 Bell Street
Edmonds, WA 98020
Tel. (425) 440-3411
E: frank@homsherlawgroup.com

repeatedly tried to get leadership to approve the reasonable accommodation and allow ROB to keep his job and to have his years of experience available.

52.     As a senior mechanic, Rob would have been able to work alone with no staff contact in that location. FAS HR staff stated this option was not a good "permanent" solution as Rob would, at some point, need to rejoin staff for training and celebrations. However, this solution would have worked until a future date in which the vaccine mandate is no longer in place.

53.     The City of Seattle did not acknowledge that ROB had natural immunity, which gave him protection against the virus. The whole point of the vaccines was to provoke a reaction by the human immune system to create antibodies. It made no sense that a person proven to have the antibodies then would be deemed a threat to his fellow workers. The City treated ROB as if he was contagious and a threat. But, science had already determined that asymptomatic transmission was rare. ROB has never had a symptomatic case of Covid-19.

54.     The City of Seattle and ROB's department also refused to acknowledge the effectiveness of N95 Masks, which are the best on the market and inhibit transmission of COVID-19. The City could have retained employees by using N95s and periodic testing. Instead, the City treated those designated as "unvaxxed" harshly and inflexibly. The City acted as if it never intended to keep any employees who did not get vaxxed.

55.     His manager, Lisa Reager, recommended creating a new job – Fleet Management SPD Specialist-Work Coordinator – a telework position proposed in late February that would make good use of ROB's skills and enhance shop operations. Senior management rejected this suggestion as well.

**Law Office of Frank S. Homsher**
510 Bell Street
Edmonds, WA 98020
Tel. (425) 440-3411
E: frank@homsherlawgroup.com

56.    Lisa Reager also informed senior leadership that it would likely cost the City of Seattle approximately $200,000 to train a replacement for ROB's expertise if they continued to refuse to reasonably accommodate his disability and terminated him.

57.    In a February 16, 2022 announcement, Finance and Administrative Services ("FAS") Director, Calvin Goings, exhorted "Critically, every employee is vaccinated."

58.    That same day, ROB received notice that his last day in his position would be March 2, 2022. Mr. Goings appeared to be on a campaign to get all employees in his department vaxxed and release all those who did not, no matter what the reason was.

59.    Following his last day on the job, Rob started to draw down his sick leave while Brian Sharkey conducted an ADA job search.

60.    Other Departments have granted accommodations reasonably, but not FAS.

61.    FAS did not approach ROB's accommodation process in good faith. It was unwilling to continue temporary accommodations when vaccine mandates were ending worldwide and would likely end in Washington State sooner than later. Countries recognized that the vaccines were not effective against the Omicron variant, so many countries have dropped the ineffective mandates. Seattle continued on its singular course, ignoring the recent conclusions reached by wise world leaders.

62.    Bizarrely, the City of Seattle continued to request that Rob get the second MODERNA shot even though to do so would put ROB at risk of a severe reaction and even death.

63.    It is disconcerting that the FAS Department did not try to accommodate ROB since FAS and the City of Seattle caused ROB's injury through their reckless one-size-fits-all mandate.

COMPLAINT FOR DAMAGES
*(Stahnke v. City of Seattle, et al)*
Page 17 of 23

**Law Office of Frank S. Homsher**
510 Bell Street
Edmonds, WA 98020
Tel. (425) 440-3411
E: frank@homsherlawgroup.com

64.   Has our society gotten to the point where our institutions can blatantly harm their employees then usher them out the door in the coldest and harshest of ways as if they (the City) did not harm them to achieve a 100% experimental shot rate?

65.   FAS decided to terminate a highly trained and experienced Senior Mechanic with specific SPD knowledge from his specialized position instead of making an accommodation to allow him to work in an isolated location until the end of the vaccine mandate.

66.   ROB, 56, would have started to earn substantially more pension benefits each service year from the City's pension plan. Thus, the City will save future pension plan expenses by terminating Rob before allowing him to increase his benefit over his last eight years substantially.

67.   Because of the City's vehemence against accommodating ROB, it is not far-fetched to infer that ROB's age and future costs to the City played a role in the drama.

68.   FAS has made medical accommodations in prior years, but the staff has heard that FAS senior management does not want to make such accommodations due to the Covid-19 situation. The hard line seems to be evidence that the City is explicitly trying to punish those who resist the vaccine who tend to be of a different political persuasion from Seattle's ruling class.

## IV.   CAUSES OF ACTION

### FIRST CAUSE OF ACTION:
### VIOLATION OF THE NINTH AND FOURTEENTH AMENDMENTS
### (ALL DEFENDANTS)

69.   Plaintiff incorporates paragraphs 1-68 herein by reference.

70.   The Supreme Court has recognized that the Ninth and Fourteenth Amendments protect individuals' right to privacy. A "forcible injection … into a nonconsenting person's body represents a substantial interference with that person's liberty[.]" Washington v. Harper, 494 U.S. 210, 229 (1990). The common law baseline is also a relevant touchstone that grew into the relevant

COMPLAINT FOR DAMAGES
*(Stahnke v. City of Seattle, et al)*
Page 18 of 23

**Law Office of Frank S. Homsher**
510 Bell Street
Edmonds, WA 98020
Tel. (425) 440-3411
E: frank@homsherlawgroup.com

constitutional law. See, e.g., <u>Cruzan v. Dir., Mo. Dep't of Public Health</u>, 497 U.S. 261, 278 (1990) ("'At common law, even the touching of one person by another without consent and without legal justification was a battery'). See W. Keeton, D. Dobbs, R. Keeton, & D. Owen, PROSSER AND KEETON ON LAW OF TORTS § 9, pp. 39-42 (5th ed. 1984).); <u>Schloendorff v. Society of N.Y. Hosp.</u>, 211 N.Y. 125, 129-130, 105 N.E. 92, 93 (1914) (Cardozo, J.) ('Every human being of adult years and sound mind has a right to determine what shall be done with his own body; and a surgeon who performs an operation without his patient's consent commits an assault, for which he is liable in damages.').

71.     Subsequent Supreme Court decisions have made explicit that the Constitution protects a person's right to "refus[e] unwanted medical care." <u>Cruzan</u>, 497 U.S. at 278; <u>King v. Rubenstein</u>, 825 F.3d 206, 222 (4th Cir. 2016) (recognizing same).

72.      This right is "so rooted in our history, tradition, and practice as to require special protection under the Fourteenth Amendment." <u>Washington v. Glucksberg</u>, 521 U.S. 702, 722 n.17 (1997).

73.     On occasion, the U.S. Supreme Court has agreed with the forced injection of residence of a state. <u>See</u> <u>Jacobson v. Massachusetts</u>, 197 U.S. 11 (1905). This case is distinguishable because there was no emergency sufficient to mandate any experimental shot. The mandate forced inoculation of working-age people who did not need the vaccine would likely suffer more harm than good from taking the shot.

74.     Coercing City of Seattle employees to receive a EUA vaccine for a virus that presents a near-zero risk of illness or death to them and to which there successfully used early treatment COVID-19 protocols used around the world that were saving lives constituted an abuse of power by Mayor DURKIN both on the State level and the U. S. Constitutional level.

COMPLAINT FOR DAMAGES
*(Stahnke v. City of Seattle, et al)*
Page 19 of 23

**Law Office of Frank S. Homsher**
510 Bell Street
Edmonds, WA 98020
Tel. (425) 440-3411
E: frank@homsherlawgroup.com

75.    When a policy implicates a fundamental right, through coercion or otherwise, the strict scrutiny standard "applies[;] a law will not be upheld unless the government demonstrates that the law is necessary to further a compelling governmental interest and has been narrowly tailored to achieve that interest." Mohamed v. Holder, 266 F. Supp. 3d 868, 877 (E.D. Va. 2017).

76.    From the detailed analysis provided above, Mayor DURKIN lacked any compelling state interest to compel the employees of the City of Seattle to take an experimental shot, with a Russian Roulette of adverse side effects, including death and permanent disability, to fend off a virus that had the mortality rate, amongst the working population of at or below the flu.

77.    Furthermore, she trampled on the Nuremberg Code meant to stop scientists/medical professionals from experimenting on people without their full and complete consent.

78.    Mayor HARRELL had a chance to end Mayor DURKIN's misguided mandate, but he did nothing, which led to ROB's termination.

79.    ROB is entitled to damages in an amount to be proven at trial for the violation of his U. S. Constitutional rights.

**SECOND CAUSE OF ACTION:**
**VIOLATION OF THE WASHINGTON LAW AGAINST DISCRIMINATION –**
**DISABILITY DISCRIMINATION – FAILURE TO ACCOMMODATE**
**(DEFENDANT CITY OF SEATTLE)**

80.    Plaintiff incorporates paragraphs 1-79 herein by reference.

81.    ROB STAHNKE had a physical impairment that substantially limited his ability to work in the City of Seattle. He was unable to take the second MODERNA experimental shot because of his body experienced extreme physical reactions to the first shot. As a result, he was not able to perform his work as required – as a fully vaxxed City employee. The City caused ROB's disability by making the vaccine mandate a one-size-fits-all – regardless of the consequences – solution.

**Law Office of Frank S. Homsher**
510 Bell Street
Edmonds, WA 98020
Tel. (425) 440-3411
E: frank@homsherlawgroup.com

82.     ROB was qualified to perform the essential functions of his job as a senior motorcycle mechanic even though he was still suffering from the deleterious after-effects of his body's reaction to the MODERNA experimental shot.

83.     ROB gave his employer notice that he had a medical exemption regarding the second MODERNA shot; the City accepted his exemption. At this point, the City had to participate in a good faith effort to accommodate ROB through an interactive process.

84.     As detailed above, despite having several options for accommodating ROB, the City held firm as if the mandate would never end. The City failed to affirmatively adopt measures that were available to the employer and medically necessary to accommodate the abnormality.

85.     Rather, internal FAS emails obtained through public disclosure requests reveal that FAS leadership did not want to accommodate any City of Seattle employee who sought an exemption from the City's Covid-19 vaccine mandate.

86.     The City's unreasonable approach to accommodation proximately harmed ROB, in addition to his aforementioned physical and emotional injuries sustained due to the forced Covid-19 vaccination.

87.     ROB is entitled to damages under the Washington Law Against Discrimination in whatever is permitted by the statute for the City of Seattle causing his disability and failing to reasonably accommodate him.

**THIRD CAUSE OF ACTION:**
**NEGLIGENCE**
**(DEFENDANT JENNY DURKIN)**

88.     Plaintiff incorporates paragraphs 1-87 herein by reference.

89.     Mayor Durkin had a duty to protect the health and safety of the City's employees.

COMPLAINT FOR DAMAGES
*(Stahnke v. City of Seattle, et al)*
Page 21 of 23

**Law Office of Frank S. Homsher**
510 Bell Street
Edmonds, WA 98020
Tel. (425) 440-3411
E: frank@homsherlawgroup.com

90.     She was required to use reasonable care in determining whether it was lawful to proclaim a vaccine mandate when the Pfizer, Moderna, and Johnson & Johnson shots were designated for Experimental Use Authorizations using untested technologies and the VAERS reporting system and the European vaccine injury reporting systems showed that persons taking the vaccine could suffer substantial injuries including death. Based on the EUA status of these vaccines alone, Mayor DURKIN lacked the authority to mandate injections by all City of Seattle employees because she was subjecting the City's employees to a grotesque game of Russian Roulette.

91.     Mayor DURKIN also knew or should have known that SARS COVID 2 did not present a great risk to working aged people, the vaccines were "leaky" such that they did not offer full protection against the virus and they offered only temporary protection – much less than a standard vaccine would.

92.     Mayor DURKIN also knew or should have known that medical doctors around the world were successfully treating patients with early treatment protocols which saved lives by shortening the disease.

93.     Despite the fact that she knew or should have known these things, she initiated an experimental shot mandate for all City of Seattle employees without taking into account that this one-size-fits-all approach might harm a lot of people who were playing the virus Russian Roulette.

94.     Mayor DURKIN breached her duty when she enacted a vaccine mandate that would do more harm than good at the expense of the health of dedicated City of Seattle employees.

95.     Mayor DURKIN's illegal mandate proximately harmed ROB STAHNKE, as detailed above.

96.     ROB is entitled to damages in an amount that will be proven at trial.

## V.     RELIEF REQUESTED

COMPLAINT FOR DAMAGES
*(Stahnke v. City of Seattle, et al)*
Page 22 of 23

**Law Office of Frank S. Homsher**
510 Bell Street
Edmonds, WA 98020
Tel. (425) 440-3411
E: frank@homsherlawgroup.com

Plaintiff ROB STAHNKE seeks the following relief:

1.      Consequential damages;

2.      Special damages;

3.      All damages available under the Washington Law Against Discrimination;

4.      Attorney's Fees and Costs;

5.      Prejudgment and Post-judgment interest; and

6.      Any additional remedies that the Court deems just and equitable.

Dated this 2nd day of JANUARY, 2023,

/s/ Frank S. Homsher
Frank S. Homsher, WSBA #26935
Law Office of Frank S. Homsher
510 Bell Street
Edmonds, WA 98020
(425) 320-9628
frank@homsherlawgroup.com
*Attorney for Plaintiff Rob Stahnke*

COMPLAINT FOR DAMAGES
*(Stahnke v. City of Seattle, et al)*
Page 23 of 23

**Law Office of Frank S. Homsher**
510 Bell Street
Edmonds, WA 98020
Tel. (425) 440-3411
E: frank@homsherlawgroup.com